AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

1937 14th Street NW, # 201, Washington DC

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER:

(Further described below)

I ___Daniel W. Spotts_____ being duly sworn depose and say:

I am a(n)___Special Agent of the Federal Bureau of Investigation,_____ and have reason to believe
                   (Official Title)

that (name, description and or location)
      within the premises of 1937 14th Street NW, # 201,

in the District of Columbia, there is now concealed a certain person or property, namely (describe the person or property to be searched)
      See Attachment A

which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)
      evidence of money laundering and unlicensed monetary transmissions, in violation of 18 U.S.C. Sections
      1956(a)(3)(B), 1956(h), and 1960(a).

concerning a violation of Title 18 U.S.C.  United States Code, Section(s) 1956(a)(3)(B), 1956(h), and 1960(a) . The
facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN

Continued on the attached sheet and made a part hereof.

Amy Jeffress
National Security Section
(202)202-514-7624

_____
Signature of Affiant Daniel W. Spotts, FBI

Sworn to before me, and subscribed in my presence

_____
Date

at Washington, D.C.

_____
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Your Affiant, Special Agent Daniel W. Spotts of the Federal Bureau of Investigation ("FBI"), deposes and say as follows:

1.      Your Affiant is a Special Agent with the FBI.  Your Affiant has been a sworn member of the FBI since 1994 and is currently assigned to the FBI Salisbury Resident Agency in Salisbury, Maryland.  During that time, your Affiant has attended and successfully completed basic agent training at the FBI Academy in Quantico, Virginia.  The training at the Academy consisted of both classroom instruction and practical exercises dealing with all facets of criminal violations, including white collar crime.  Throughout the course of his law enforcement career, your Affiant has conducted and/or participated in numerous white collar crime investigations, to include money laundering matters, as well as the preparation and execution of document search warrants.

2.      On September 12, 2007, a federal grand jury returned a superseding indictment charging Mohammad AHSAN and Abdul REHMAN, a/k/a Rahim, with money laundering and conspiracy to do same in violation of 18 U.S.C. §§ 1956(a)(3)(B) and 1956(h).  AHSAN was also charged with operating an unlicensed money transmission business in violation of 18 U.S.C. § 1960(a), and failure to file currency transaction reports in violation of 31 U.S.C. §§ 5313(a) and 5322(b).

3.      The charges in this case arose from an ongoing sting investigation utilizing a cooperating witness ("CW").  Between November 2004 through on or about March 22, 2007, the CW, acting at the direction of agents with United States Customs and Immigration Enforcement ("ICE") and the FBI, provided a total of approximately $520,000 to AHSAN for the purpose of

transferring the monies abroad through the "hawala" method of currency transfer.[1]  The CW represented himself to be involved in numerous illegal activities, including: large-scale international drug trafficking, and international smuggling of counterfeit cigarettes and other goods and contraband, including weapons.  The CW represented to AHSAN and his associates that the monies sought to be transferred were the proceeds of, or related to, drug trafficking.

4.    All of the CW's money transfers were arranged by AHSAN and took place at AHSAN's residence at 424 Old Line Avenue in Laurel, Maryland.  AHSAN owns and operates Pak Exchange Services ("Pak Exchange"), which is located at 1937 14th Street, #201, N.W., in Washington, D.C.  Pak Exchange is authorized under D.C. law to conduct a money transmission business within the District of Columbia as an authorized delegate of a California business called Maniflo Money Exchange, Inc. ("Maniflo").  Though Maniflo is also licensed to conduct a money transmission business in the State of Maryland, neither AHSAN nor Pak Exchange Services are designated as authorized delegates of Maniflo in Maryland.  State licensing records indicate that neither AHSAN nor Pak Exchange Services are licensed, either independently or as authorized delegates, to conduct a money transmission business within the State of Maryland as required by Maryland state law, specifically, 12 Md. Code Ann., Financial Institutions, § 12-405.

5.    The CW, who is a native of Pakistan, plead guilty over twenty years ago to participating in a heroin importation scheme.  Although the CW was facing possible deportation at

---

[1]  A "hawala" is an informal money transfer system utilizing a network of persons and/or businesses to facilitate the transfer of monies across domestic and international borders without reliance upon conventional banking systems and regulations.  Such transfers involve handing over monies to an individual in the United States, who, in turn, arranges for the equivalent amount of monies, minus commissions, to be paid back outside of the United States to an individual, or financial account, as designated by the person seeking to have the currency transferred.

that time, he was allowed to stay in the United States in order to cooperate with Customs and DEA officials in connection with ongoing investigations. Since that time, the CW has worked periodically as a paid informant for ICE. He is under an order of supervision issued by Legacy Immigration and Naturalization Service, and has an application pending for an S-Visa. Throughout the course of his cooperation, the CW has provided proven and reliable information to federal law enforcement authorities. In addition, he has testified as a government witness in cases prosecuted in federal court. To date, the CW has been paid approximately $150,000 in connection with his services to law enforcement.

6.     The superseding indictment remains sealed pending the defendants' arrests and conclusion of the investigation. The indictment includes a criminal forfeiture allegation seeking forfeiture of $520,000, which represents the total amount of monies involved in the hawala transfers arranged by AHSAN.

I.     **SEARCH LOCATIONS**

7.     This affidavit is being submitted in support of a search warrant for the following locations:

a)     <u>424 Old Line Avenue, Laurel, Maryland</u> - This the residence of Mohammad AHSAN. This location is described as a ranch-style single family home, beige in color with black shutters on the front windows, and is located in a residential neighborhood. Property and utility records indicate that home and utilities are listed in the name of AHSAN's wife, Rukhsana Ashraf. A covered stoop is located at the front door, which is white in color with small panes of glass. The front door faces Old Line Avenue. The residence rests at the southeast corner of the intersection of Old Line Avenue and Dameron Street. A driveway and a covered entry way into the house is located

on the south side of the residence, which faces Dameron Street.

      b)     1937 14th Street, #201, N.W., Washington, D.C. - This is the office location for Pak Exchange Services, a/k/a Pak Exchange. The location is described as a three-story building with dark-painted brick on the first level. There is white siding and the second and third levels. The building is located in a residential/commercial area and sits on the southeast corner of 14 and U Streets in Northwest, Washington, D.C. The entrance to the second and third floors is through a street-level brown door containing a window, and marked with graffiti and the number "1937."

      8.     The information contained herein is based upon your Affiant's personal knowledge and belief, and upon information obtained from the CW, other sworn law enforcement officers, public records, and subpoenaed documents. During his career as a trained investigator, your Affiant has had the occasion to debrief informants and witnesses that had personal knowledge and information as to the manner and method by which criminals launder funds and engage in other money-related crimes. Based on these debriefings and your Affiant's personal experiences, your Affiant knows that it is common for those who engage in conspiratorial criminal conduct, including money laundering, to do the following:

      a.     maintain currency and evidence of financial transactions relating to obtaining, transferring, secreting, and or expending monies acquired by illegal means, in secure locations such as their residence, vehicles, places of business, "stash houses," and/or self storage lockers, the latter of which are maintained in order to avoid detection by law enforcement;

      b.     maintain within their premises, vehicles, places of business, safe deposit boxes, "stash houses," and/or self storage lockers, records of prior financial transactions and books and papers containing names, addresses, telephone numbers of customers, financial supply sources,

and other co-conspirators and associates;

      c.     maintain within their premises, vehicles, places of business, safe deposit boxes, "stash houses," and/or self storage lockers, photographs that are taken of themselves, co-conspirators and associates, assets, and financial-related proceeds;

      d.     maintain within their premises, vehicles, places of business, safe deposit boxes, "stash houses," and/or self storage lockers, records of transportation on/in commercial carriers, private cars, and through mail carriers to and from their fund source and distribution points;

      e.     utilize electronic devices including computers, facsimile machines, telephone answering machines, cellular telephones, and digital and text contact pagers to communicate and record transactions with their co-conspirators, which devices often contain electronic address/telephone books that the subjects use to store the names and telephone numbers of their co-conspirators;

      f.     place assets in names other than their own, including nominees, such as family members, friends, businesses, and business associates, in order to avoid detection of these assets by law enforcement, all the while continuing to use said assets and exercise dominion and control over them;

      g.     acquire and maintain certified false identity documents to conceal their asset ownership and to conceal other movement and/or activities in furtherance of the criminal activities;

      h.     maintain on hand large amounts of currency in order to operate and finance their ongoing criminal activities;

      i.     utilize foreign and domestic banks and their attendant services, securities, cashier's checks, money orders, money drafts, letters of credit, brokerage houses, real estate, shell

corporations and business fronts in order to legitimize and conceal large amounts of cash obtained

to further, or proceeds or, their criminal conduct,, and if off-site locations are used, maintain and use

safe deposits box keys, records and receipts, as well as records, receipts, and/or documents about self

storage lockers, mail pickup and telephone answering services.

        9.      All of the meetings and most, if not all, of the phone conversations between the CW

and defendants have been recorded.  The conversations were primarily in a foreign language, either

Punjabi or Urdu.  The vast majority of the recorded conversations have been transcribed and

translated by FBI interpreters.  Unless noted otherwise, all excerpts of recorded conversations

referenced herein are taken from the English language translations of the conversations.  All of the

money transactions, both in the United States and overseas, were surveilled by law enforcement

agents, and the CW was searched for contraband both before and after the transactions with negative

results.

## II.    INVESTIGATIVE EVIDENCE

        10.     The CW initially learned of AHSAN through Mohammad Riaz GUJJAR, who

advised the CW that AHSAN could transfer the informant's monies through the hawala system.

(GUJJAR is currently charged in a sealed indictment with bribery and racketeering stemming from

a related investigation utilizing the CW.)  At the end of November 2004, the CW met with AHSAN

for the first time to ascertain if AHSAN would be interested in handling some hawala transactions

for him.  The CW told AHSAN that he deals in hashish and heroin.  AHSAN told him, "Be very

careful, the situation is very dangerous." AHSAN agreed to transmit monies for the CW, but said,

"The thing is this has to be kept between you and me - you will not tell anybody."  The CW told

AHSAN, "my money is not clean,"and AHSAN asked, "Do you have any business here?  Do you

have any business license like Import/Export or any?" The informant responded that he had, "but they are only on paper." AHSAN said, "You can transfer from their account." The CW understood AHSAN to be directing him to use his purported business accounts in order to legitimize the hawala transactions.

11.     From that point forward, AHSAN arranged for five separate hawala transactions involving the pick up of currency in Pakistan, England, Spain and the Netherlands, and deposit of monies into an account in Canada. All of the transactions, both here in the United States and at overseas locations, were surveilled by law enforcement agents. In the case of each money transfer, AHSAN would receive currency from the CW at his home in Laurel, and then make arrangements for the equivalent amount of monies, minus fees, to be deposited in the CW's designated foreign bank account, or to be delivered outside of the United States to the CW or his designated representative. In return for conducting the money transfers, AHSAN and his foreign associates kept between five to ten percent of the total amount of currency sought to be transferred on each occasion by the CW.

12.     In those instances where cash monies were to be picked up in a foreign country, AHSAN would give the CW information about who he (the CW), or his designated representative (either unwitting participants or law enforcement officers), would meet in whatever county they agreed on. AHSAN would tell the CW how he or his designated representative could reach AHSAN's foreign contact for each transaction. On some occasions, AHSAN used codes, such as serial numbers on dollar bills, for the parties involved in the transactions to relay to each other in order to confirm each other's identities.

13.     The CW's first hawala transaction with AHSAN occurred on July 28, 2005, at

AHSAN's residence in Laurel.  The CW gave AHSAN $20,000 for a hawala transaction involving

a hand-to-hand transfer of cash in Pakistan.  AHSAN asked the informant to get him two guns from

the black market in Pakistan.  The CW told AHSAN that the money was not legitimate and that it

was "for charity" for "those poor guys are giving up their lives ... they are giving up their lives on

the name of Islam.  This is the least we can do."  AHSAN agreed that "charity should be given out"

and stated, "all is well if end is well."  The men discussed the black market in Pakistan.  AHSAN

commented that "greed is good as long as you living and moving ... your money is good if you can

use it."  On August 3, 2005, an individual acting as the CW's designated representative picked up

1,148,500 rupees in Pakistan from AHSAN's associate, which monies represented the equivalent

of what the CW had provided to AHSAN on July 28, 2005, minus commissions.

14.     On October 19, 2005, the CW went to AHSAN's house in Laurel and gave him

$50,000 for a hawala transaction in London, England.  AHSAN told the CW, "don't mention my

name in front of anybody.  Keep it to yourself."  AHSAN asked the informant if his "legal status

[was] in proper order ... what is your legal business?"  The CW understood AHSAN to be asking

what, if any, front business the CW had to cover his dealings.  The CW stated that he had an

import/export business called Afridi Trading.  AHSAN warned the CW that "the times are uncertain

... they catch you from the bank ... or catch you from tax."  The CW stated, "[they] keep an eye on

... it is in plain sight, that is why we don't involve the bank too much.  Just the import/export

business."  AHSAN replied, "just show for only your legal.  That's it."  The CW understood

AHSAN to be saying that the CW should only rely on monetary figures associated with his front

business.  The CW told AHSAN that there is too much money, and AHSAN replied, "No one should

know about it .. Just don't (gossip) on the phone."  On November 2, 2005, the CW's designated

representative received £25,940 from AHSAN's associate in London to complete the hawala transaction.

15.    On January 19, 2006, the CW went to AHSAN's residence and gave him $150,000 for a hawala transaction in Spain.  AHSAN asked the CW, "What is your main work?"  The CW replied, "it is work for my country ... black marketing."  The CW then asked AHSAN if he had been to Khyber (in Pakistan) and said things have "become better for us these days."  AHSAN asks if people get caught and went on to state, "what I'm am trying to say ... is what if the Kabul people ... get caught and get me in trouble as well ... and all of my money goes with them..."  The informant said that his people were powerful and could fix things in a minute.  AHSAN said, "don't mention my name ..."This system that I have for you?  It's too much - you don't know channels it goes through . . . I'm just taking care of my family, so please make sure that no one knows about this."

16.    The two men went on to discuss the commission each party to the transaction would get.  AHSAN stated,  "if I profit on it alone then your money won't be delivered."  AHSAN reiterated to the CW that no one know what they were doing.  When the CW mentioned his "people," AHSAN stated, "when they get caught then they tell which person sent the money."  AHSAN suggested to the CW that he should start another business, like a gas station, and AHSAN would run it for him.  AHSAN stated, "we need a side business ... in case this business stops one day."  When the CW joked that AHSAN's business had come so far and was still going, AHSAN stated, "the DC people ... are becoming very strict now."  AHSAN talked about how dangerous the work was, and the CW joked about how easy it was to make money selling drugs, specifically referencing dollar amounts and kilos.  AHSAN asked the informant again about getting him guns.

17.    The Spain transaction ultimately fell apart due to the inability of AHSAN's foreign

contacts to come up with enough cash in Spain.  AHSAN subsequently told the CW that he lost approximately $20,000 on the deal.  On February 28, 2006, AHSAN told the CW, "The problem is that once the money is gone to overseas - it costs a lot to bring it back.  Those people don't cover expenses for outgoing transactions."  When the CW asked AHSAN why he was telling him this, AHSAN replied, "Since the illegal money," referring to the lack of monies in Spain from illegitimate sources that could be transferred to the CW.

18.     AHSAN ultimately returned $150,000 to the CW as a result of the failed Spain transaction.  AHSAN gave the CW a total of $90,000 while at AHSAN's residence in Laurel.  Another $60,000 was given to the CW by AHSAN at the Pak Exchange office in D.C. on March 8, 2006.  During that meeting, the CW complained about the problems that were caused due to the failed transaction.  He told AHSAN, " More people were going to come, they returned empty handed.  Everything got destroyed. . . it's hard work, that's why they pay, if it was not hard work then what.  It's illegal, sisterfuck, it's not legal, it's based on trust, that's why we involve less people. We knock on doors of all people to come work for us, no.  Like this time . . . work is based on trust." AHSAN talked about how methods to transfer money were evolving and admonished the CW not to tell anyone about him.

19.     On April 13, 2006, the CW met AHSAN at the Laurel residence and gave him $200,000  for a hawala transfer in Holland.   AHSAN reminded the CW to be sure that his (AHSAN's) name was not used anywhere.  The CW replied, "these people of ours are strong people. These are not ordinary people."  AHSAN said, "Just don't speak my name with them ... situation is very tight nowadays - very tight."  AHSAN told the CW he needed a Kalishnikov - "a real one" - delivered to his home.  AHSAN warned the CW not to keep a "good car" so as not to raise

suspicions. On May 3, 2006, the CW met with AHSAN's associate in Amsterdam, Abdul REHMAN, a/k/a Rahim, and received €135,770. According to contemporaneous notes made by the CW ( recording is not allowed in Holland), the CW and REHMAN discussed the drug business, the fact that the monies being picked up by the CW were destined for payment of drugs, and the possibility of engaging in joint drug deals.

20.    On September 7, 2006, the CW met with AHSAN at the Pak Exchange office in D.C. AHSAN stated that he had just returned from three months in Pakistan and had been waiting for the CW to deliver a gun to his house there. The CW asked about a hawala transaction involving deposit of monies into an account in Canada. He stated that he wanted the money to be moved there because he had to pay dollars to the people who brought illegal goods for him. The CW also said that he would want to transfer about $300,000 to Europe in the future. AHSAN assured the CW that he could handle both transactions. AHSAN warned the CW not to do business with everybody because if they were caught by the police, they would start naming names.

21.    On September 14, 2006, the CW went to AHSAN's residence in Laurel to deliver $100,000 for a hawala transaction involving deposits into a Canadian account. During discussion with AHSAN and two other men at the residence, the CW stated that he could send anything out of the country, and that currently there was a demand for bullets and they were being concealed for shipment inside generators. There was a lengthy discussion about what the CW could ship on the black market and send to Pakistan. AHSAN spoke about how everything on the Bara market (black market in Pakistan) was illegal, stolen and smuggled, to which the CW advised that nothing he did was legitimate. The CW also spoke about how drugs can get smuggled in big ships and how easy it is to smuggle 20 kilos at a time. He also spoke about much cash can be generated by multi-kilo

11

drug deals.

22.    Outside of the house (and the presence of the other two men), the CW expressed concern to AHSAN about handing money to him in front of the other men.  AHSAN said, "Don't worry, he is my friend."  He then said, "Do not set me up, anytime.... Do not set me up .... anything illegal."  The CW then told AHSAN to do the transfer quickly and have the money deposited into the account in dollars, because "when illegal goods come in then you have to pay them in dollars."  When AHSAN asked about another hawala transaction to Europe, the CW said he was not comfortable talking about it in front of the other men.  AHSAN replied, "You do not know them, they are my friends and I am not going to tell what Khan (a nickname for the CW) came for."

23.    Between September 29 and November 3, 2006, AHSAN's associate in Canada coordinated eight deposits in Canada totaling $82,000 that were made into the Canadian account provided by the CW (an undercover account).  An unusually high commission of $18,000 was kept by AHSAN and his Canadian associate and the transaction took an exceedingly long time to complete.  These factors spawned many discussions between the CW and AHSAN, in which the CW expressed frustration with the chain of events.  On November 14, 2006, in a phone conversation with the CW, AHSAN stated that his Canadian associate had to buy "dollars from Pakistan," which came at a very high price and were difficult to obtain.  AHSAN  admitted that of the $18,000, he retained $10,000 for himself.  He told the CW that they should meet to talk, since "all phones are being taped.... I will not talk on the phone because all phones are recorded."  The CW met with AHSAN later that day at the Laurel residence and received a $2,000 refund from AHSAN on his commission.

24.    On March 22, 2007, the CW received a call from AHSAN.  AHSAN complained about the fact that the CW stopped coming to see him and stated that the CW must be upset with

him. The CW told AHSAN that he handled the last transaction poorly and would have ruined the

CW's credibility were it not for the fact that the CW's people were not from his country. AHSAN

stated that he understood and reiterated that he did not make a profit on the last transaction. AHSAN

offered to do another transaction for the CW at a cheap price. He also asked the CW to come over

for tea. (This conversation has not yet been transcribed and the summary stated herein is based on

the debriefing of the informant by law enforcement agents following the conversation with AHSAN).

Due to the circumstances surrounding the last transaction with AHSAN, it was determined that any

further contact between him and the CW could jeopardize the ongoing investigation involving

related defendants. Thus, there has been no contact with AHSAN since the March 2007

conversation.

      25.    The CW has been inside of the Pak Exchange office on three occasions. On February

16, 2006, the CW met with AHSAN at the Pak Exchange office to discuss the hawala transaction

in Barcelona, Spain, that was unable to be consummated (referenced in paragraphs 15-17 above).

On March 8, 2006, the CW picked up currency from AHSAN at the Pak Exchange Office

(referenced in paragraph 18 above). On September 7, 2006, the CW met with AHSAN at the Pak

Exchange Office to set up a hawala transaction for Canada. On each of these occasions, the CW

observed a computer system in the office. While at the office, the CW has observed both AHSAN

and an individual assisting him in the office utilizing the computer system. AHSAN has been on the

computer in the presence of the CW while handling other money transactions in the CW's presence.

      26.    Records on file with the District of Columbia Department of Insurance, Security and

Banking ("DISB") for Maniflo indicate that Maniflo has policy for its agents that requires all money

transactions over $10,000 to be recorded in a log. The log must contain information regarding the

date of the transaction, sender information, beneficiary information and amount sent. Maniflo also provides its agents with access to their website to provide information regarding the agents' money transactions. Based on this information and the observations of the CW at the Pak Exchange office, there is reason to believe that any computer system located at the Pak Exchange office will contain evidence relating to the transfer of monies provided by the CW and other evidence relating to the crimes charged against AHSAN and his associates.

27.    Based on your Affiant's training, knowledge, and experience and the facts stated above, and the information obtained during this three year investigation, your Affiant states that there is probable cause to believe that Mohammad AHSAN  has been and continues to engage in the crimes of: money laundering and conspiracy to do same, in violation of 18 U.S.C. §§ 1956(a)(3)(B) and 1956(h); operating an unlicensed money transmission business, in violation of 18 U.S.C. § 1960(a); and failure to file currency transaction reports, in violation of 31 U.S.C. §§ 5313(a) and 5322(b). In addition, there is probable cause to believe that within the aforementioned locations the items set forth in Attachment A will be found, all of which constitutes evidence, fruits and instrumentalities of said violations. Therefore, your Affiant requests that this Court issue a search and seizure warrant authorizing search of the location specified herein  and seizure of the items listed in Attachment A.

Your Affiant has signed this affidavit under oath as to all assertions and allegations contained herein and states that its contents are true and correct to the best of his knowledge and belief.

_____
Daniel W. Spotts
Special Agent
Federal Bureau of Investigation

Signed to and sworn before me this _____ day of September, 2007.

_____
Paul W. Grimm
Chief United States Magistrate Judge

15

## ATTACHMENT A

The following items to be seized from 1937 14th Street, N.W., # 201, Washington, DC:

1.      Books, records, receipts, bank statements, passbooks, safe deposit keys and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money.

2.      Papers, tickets, notes, schedules, receipts and other items relating to foreign and domestic travel.

3.      Address and/or telephone books and papers reflecting names, addresses and/or telephone number and other contact information of coconspirators, associates, customers and sources of financial supply.

4.      Photographs of coconspirators, associates, assets, and financial-related proceeds.

5.      Electronic devices including telephone answering machines, cellular telephones, and digital and text contact pagers.

6.      Indicia of occupancy, residency, and ownership of the premises described herein, including deeds, utility and telephone bills, and keys.

7.      Identity documents, including passports, alien resident cards, and any related immigration documents or paperwork.

8.      United States currency or other items of value such as jewelry and automobile titles.

9.      All electronic devices which are capable of analyzing creating, displaying, converting, storing or transmitting electronic computer impulses or data, that relate in any way to the items set forth in this section, including, but not limited to, electronic data processing and storage devices, computers and computer systems, all internal and peripheral storage devices, together with systems documentation, operating logs and documentation, software and instruction manuals. The search procedure of the electronic data contained in the computer operating software or memory devices, and/or computer diskettes and data cartridges may include the following techniques:

        a.      surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

        b.      "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c.      "scanning" storage areas to discover and possibly recover recently deleted data;

d.      scanning storage areas for deliberately hidden files; or

e.      performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

The person who conducts the search of the electronic computer data shall determine what data is relevant to the subject matter of this warrant. All steps taken in the search of electronic data shall be done in such a manner that preserves the privacy of non-relevant computer data. Unopened electronic mail stored in the computer hard drive may be searched in conformity with the procedures outlines herein.

All of the above constituting evidence, fruits and instrumentalities of the violations of 18 U.S.C. §§ 1956(a)(3)(B) and 1956(h) (money laundering and conspiracy to do same), 18 U.S.C. § 1960(a) (operating an unlicensed money transmission business), and 31 U.S.C. §§ 5313(a) and 5322(b) (failure to file currency transaction reports).

17